UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| OTIS ELEVATOR COMPANY<br>　　　Plaintiff; | )<br>)<br>) |
| v. | )<br>) |
| LOCAL 4, INTERNATIONAL UNION<br>OF ELEVATOR CONSTRUCTORS;<br>MICHAEL LANGER, INDIVIDUALLY,<br>and as BUSINESS MANAGER;<br>KEVIN McGETTIGAN, INDIVIDUALLY,<br>and as BUSINESS REPRESENTATIVE;<br>and all others conspiring, acting in concert<br>or otherwise participating with them or<br>acting in their aid or behalf,<br><br>　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Docket No.

November 24, 2004

# 04 ᶜᵛ 1 2 4 9 3 RGS

**MEMORANDUM OF PLAINTIFF, OTIS ELEVATOR COMPANY, IN SUPPORT OF
ITS APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND
PRELIMINARY AND PERMANENT INJUNCTION**

Plaintiff, Otis Elevator Company (hereafter "Otis" or the "Company"), submits this

Memorandum in support of its application for a temporary restraining order and preliminary and

permanent injunction pursuant to Section 301(a) of the Labor-Management Relations Act, 29

U.S.C. § 185(a).  The Company seeks an order from this Court enjoining the Defendants,

International Union of Elevator Constructors (the "IUEC"), IUEC Local 4 ("Local 4")

(collectively "Defendants" or the "Unions") and their officers, agents, representatives and

members, from continuing or engaging in, or threatening to engage in, any strike, work stoppage,

slowdown, refusal to work, sit-down or sabotage against the Company and, further, to order the

parties to arbitrate the dispute which exists between them.

Otis is engaged in the business of constructing, modernizing, repairing and servicing elevators and escalators throughout the United States. (Verified Complaint ("Complaint") ¶1). This dispute arises out of the expected refusal of Otis' elevator mechanics, who are members of Local 4, to perform critical overtime repair work, in an apparent protest of the recent termination of two union mechanics that engaged in fighting at work. (Complaint ¶16-23). Otis has learned that several of its Otis mechanics have received calls from Defendants McGettigan and Langer, informing them of a "voluntary show of support" and pressuring them not to take emergency repair calls. In addition, the mechanics today received NexTel text messages stating as follows:

> "a brother/solidarity – Support your brothers due to wronful (sic) termination. Refuse all volunteer overtime!  Call Me!  12:18P 11/24."

(Complaint, ¶18). Another mechanic, Mike Keenan, scheduled to work an overtime repair at the Prudential Center this weekend, called the union hall and when he indicated that he was planning to work as scheduled, was treated in a "belligerent" manager by the Union's business agent. (Complaint ¶¶ 20). Defendants action are causing irreparable harm to Otis, including inability to satisfy its contractual obligations and damage to relationships with customers and potential customers. (Complaint ¶¶28-32). Accordingly, and for the following reasons, Otis respectfully requests that the Court issue a temporary restraining order and preliminary and permanent injunctive relief.

## A.    The Collective Bargaining Agreement

For many years prior to 2002, the IUEC entered into a series of five-year collective-bargaining agreements with the National Elevator Industry, Inc. ("NEII"), a multi-employer bargaining group of which Otis was a member. The IUEC-NEII contracts were referred to as the Standard Agreements. The last Standard Agreement was effective from July 9, 1997 to July 8, 2002. In 2002, Otis and other elevator companies withdrew from NEII for purposes of collective

bargaining. Otis then negotiated its own collective-bargaining agreement with the IUEC (the

"Otis Agreement"), which has a term of July 9, 2002 to July 8, 2007. (Complaint ¶¶10-12).

The Otis Agreement has substantially the same language as the Standard Agreement in

many articles.[1] For example, Article XIV of the Otis Agreement (Complaint ¶13) expressly

prohibits strikes during the term of the Agreement. It provides in pertinent part:

**ARTICLE XIV**
**STRIKES AND LOCKOUTS**

> **Par. 1.**  It is agreed by both parties to this Agreement that so long as the provisions herein contained are conformed to, no strikes or lockouts shall be ordered against either party. It is understood that this Paragraph shall be applied and construed consistent with the provisions of Article IV, Par. 11 concerning Grievance and Arbitration procedure.

> **Par. 2.**  No strike will be called against the Company by the Union unless the strike is approved by the International Office of the International Union of Elevator constructors. Sufficient notice shall be given to the Company before a strike shall become effective. Except in the case of Contract Service Work as specified in Article IX of this Agreement, work stoppages brought about by lawful picketing or strikes by building trades local unions affiliated with Building Trades Councils shall not constitute a strike within the meaning of this Article.

> **Par. 3.**  In the event of a strike, work stoppage or lockout affecting Mechanics, Helpers and Apprentices on New Construction or Repair Work, men working on Contract Service shall not be affected by such strike, work stoppage or lockout, and the Union will supply competent men to the Company to do all work covered under Contract service whether such men are continuously employed in this work or not prior to the strike, work stoppage or lockout.

Article XV of the Otis Agreement further requires that "[a]ny difference or dispute

regarding the application and construction of this Agreement" shall be resolved under the

---

[1]      The Otis Agreement is substantially the same as the Standard Agreements at issue in <u>National Elevator Indus., Inc. v. International Union of Elevator Constructors</u>, 776 F.2d 374, 376-77 (1st Cir. 1985), where the employer successfully obtained an injunction against an illegal work stoppage.

grievance/arbitration procedure set forth in the Agreement, which provides for final and binding arbitration by an impartial arbitrator. The Agreement covers the terms and conditions of employment of elevator constructor Mechanics, Helpers and Apprentices employed by Otis in Massachusetts. Article IV of the Agreement provides that all elevator and escalator construction, service, repair and modernization must be performed exclusively by elevator constructor Mechanics, Helpers and Apprentices represented by the IUEC. Id. ¶¶15.

**B.    The Illegal Work Stoppage**

As set forth above, Otis' elevator mechanics are refusing to work overtime shifts in an apparent protest of the termination of two other union employees. The Defendant Union's activities are not in question, as they were specifically set forth on NexTel text messages that were sent to Otis' elevator mechanics, as described above. The refusal of Otis' mechanics to perform overtime repair work, as required by the Agreement between Local 4 and Otis, is highly damaging to Otis' business and its relationship with its customers, who rely on Otis to conduct emergency repairs to elevators at hospitals, shopping malls and office buildings. Moreover, the Union's work stoppage threatens public safety where, for example, a mall elevator full of people could break during the upcoming holiday weekend, and no mechanic will appear on an emergency basis to conduct the necessary repairs.

After this refusal to perform work as required by the Agreement, Otis demanded that the IUEC and Local 4 cease their illegal work stoppage and file a grievance about the dispute. The Union has refused to take these steps. (Complaint ¶25).

**II.    ARGUMENT**

    **A.    This Court Has Jurisdiction To Enjoin Defendants' Violation Of The No-Strike Clause And To Order The Parties To Arbitrate.**

This Court has jurisdiction, pursuant to Section 301(a), Labor-Management Relations Act, 29 U.S.C. § 185(a) (1970), to issue a temporary restraining order, preliminary and permanent injunctive relief, and to order the parties to arbitrate in a case involving a dispute concerning a work stoppage and a collective-bargaining agreement.  Section 301(a) provides:

> (a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

In Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235 (1970), the Supreme Court, overruling its earlier decision in Sinclair Refining Co. v. Atkinson, 370 U.S. 195 (1962), held that a federal court may enjoin a strike in breach of a no-strike clause where the strike arises from an arbitrable grievance pursuant to the collective-bargaining agreement. Concluding that national labor policy would be furthered if the parties submitted their dispute to the mutually agreed upon procedures set forth in the collective-bargaining agreement, the Court held that the Norris-LaGuardia Act does not preclude issuance of an injunction in this situation:

> The Sinclair decision, however, seriously undermined the effectiveness of the arbitration technique as a method peacefully to resolve industrial disputes without resort to strikes, lockouts, and similar devices.  Clearly employers will be wary of assuming obligations to arbitrate specifically enforceable against them when no similarly efficacious remedy is available to enforce the concomitant undertaking of the union to refrain from striking.  On the other hand, the central purpose of the Norris-LaGuardia Act to foster the growth and viability of labor organizations is hardly retarded - if anything, this goal is advanced - by a remedial device that merely enforces the obligation that the union freely undertook under a specifically enforceable agreement to submit disputes to arbitration.

398 U.S. at 252-53.

The United States Court of Appeals for the Sixth Circuit has articulated the following requirements which must be satisfied in order for a Boys Markets injunction to be issued:

1.    "First, the controversy must involve or grow out of a labor dispute within the meaning of Section 4 of the [Norris-LaGuardia] Act."

5

2.    "Second, a full evidentiary hearing must be held."

3.    "Third, the court must find that the dispute underlying the controversy is subject to binding arbitration under the terms of the collective bargaining agreement."

4.    "Finally, the traditional equitable bases for injunctive relief must be met."

Allied Sys., Ltd. v. Teamsters Nat'l Auto. Transporters Indus. Negotiating Comm., 179 F.3d 982, 987 (6th Cir. 1999), cert. denied, 528 U.S. 965 (1999) (citation omitted)); see also Complete Auto Transit, Inc. v. Reis, 614 F.2d 1110, 1113-14 (6th Cir. 1980) (holding that district court should have issued Boys Markets injunction prohibiting strike over arbitrable dispute), aff'd, 451 U.S. 401 (1981); Winston v. General Drivers, Warehousemen & Helpers Local Union No. 89, 879 F. Supp. 719, 723-26 (W.D. Ky. 1995) (granting Boys Market injunction); United States Steel Corp. v. United Mine Worker of America, 1971 U.S. Dist. LEXIS 12250, 77 L.R.R.M. 3134 (E.D. Ky. 1971) (same).

In the present case, each of these conditions is met.

### 1.    This Case Arises Out Of A Labor Dispute Within Section 4 Of The Norris LaGuardia Act

This case unquestionably arises out of a labor dispute as defined in Section 4 of the Norris LaGuardia Act. Otis and the Union are parties to a collective bargaining agreement which defines the relationship between the parties. The instant dispute arises from a work stoppage initiated by the Union in violation of the Agreement, which specifically sets forth grievance procedures to be utilized in the event of the challenged termination of a Union employee. The first element supporting issuance of a Boys Markets injunction therefore is satisfied. See discussion supra pp. 2-5.

### 2.    A Full Evidentiary Hearing Must Be Held

As set forth in the Verified Complaint, this dispute is a matter of the utmost urgency. If the Union's illegal work stoppage is allowed to continue, Otis's ability to fulfill its contractual commitments will be compromised, contracts between third parties will be adversely affected, damage to Otis's good will and business will continue to grow, and public safety could be threatened where broken elevators are not being repaired on an emergency basis. (Complaint ¶¶). Otis therefore is prepared to proceed with a Hearing in this matter immediately, without any delay. In addition, to preserve the status quo, and to prevent additional harm to Otis during the pendency of this dispute, Plaintiff requests that the temporary restraining order be issued in the form submitted with this motion if a hearing cannot be scheduled immediately. See Winston, 879 F. Supp. at 721-22 (granting temporary restraining order prohibiting strike pending preliminary injunction hearing to be held within five days).

### 3.    The Dispute Underlying This Controversy Is Subject to Mandatory Arbitration Pursuant To The Collective-Bargaining Agreement

The dispute underlying this lawsuit is subject to mandatory arbitration under the Otis Agreement, as it directly relates to the grievance and arbitration procedures that are to be utilized where the Union is grieving the termination of a bargaining unit member. Article XV of the Otis Agreement further requires that "[a]ny difference or dispute regarding the application and construction of this Agreement" shall be resolved under the grievance/arbitration procedure set forth in the Agreement, which provides for final and binding arbitration by an impartial arbitrator. Moreover, Article XIV of the Agreement prohibits strikes. See discussion supra pp. 2-5.

The Unions' instruction to Otis employees to refuse to perform emergency overtime work, in apparent protest of the termination of two other union employees, violates applicable provisions of the Agreement and is directly within the scope of the Agreement's arbitration

7

provisions. (Complaint ¶14). The Unions' conduct is directly at odds with the grievance and arbitration procedure which requires that employees perform the disputed work "pending final resolution" of the underlying dispute. (Complaint ¶14). Art. IV, Par. 11(b).

Moreover, it is beyond dispute that Defendants' actions constitute an illegal strike. The National Labor Relations Act, 29 U.S.C. § 142(2), defines a strike to include any concerted stoppage of work or any concerted slowdown or other concerted interruption of operations by employees. See National Elevator Indus., Inc, 776 F.2d at 378 (pulling cards of temporary mechanics to withdraw those employees from skilled labor they were performing is a strike) (citing Elevator Mfrs. Ass'n of New York, Inc. v. Local 1, International Union of Elevator Constructors, 689 F.2d 382, 386 (2d. Cir. 1982)); Elevator Mfrs. Ass'n of New York v. International Union of Elevator Constructors, Local No. 1, 342 F. Supp. 372, 374 (S.D.N.Y. 1972) ("performing less work than [workers] have under a contract . . . is a refined form of torture every bit as destructive as a strike. It is a strike."); Otis Elevator Co. v. Local 1, International Union of Elevator Constructors, 684 F. Supp. 80, 80-82 (turning off beepers during lunch violates no-strike clause).

### 4.     Principles Of Equity Justifying Injunctive Relief Are Satisfied Here

In Boys Markets, the Court cautioned lower courts not to grant injunctive relief unless the alleged contract breach has "caused or will cause irreparable injury to the employer; and . . . the employer will suffer more from the denial of an injunction than will the union from its issuance." Boys Markets, 398 U.S. at 235. Otis meets this threshold.

A variety of factors constitute irreparable harm for purposes of a Boys Markets injunction. Where, as here, a work stoppage prevents an employer from performing contractual obligations regarding emergency servicing and repair, the employer suffers irreparable harm.

Elevator Mfrs. Ass'n v. International Union of Elevator Constructors, 342 F. Supp. 372, 373 (S.D.N.Y. 1972). Findings of irreparable harm have also been made where the unlawful strike has caused operations to be shut down or production to be interrupted. U.S. Steel Corp. v. United Mine Workers, 534 F.2d 1063, 1979 (3d Cir. 1976); Hilton Int'l Co. v. Asociacion De Empleados De Casino, 324 F. Supp. 492, 494 (D.P.R. 1971).

Similarly, where, as here, a work stoppage prevents employers from performing contracts, the resulting loss of business and consequent damage to the employer's reputation is irreparable harm. National Elevator Indus., 776 F.2d at 378 (irreparable harm shown where work stoppage resulted in damage to reputation); Ciba-Geigy Corp. v. Local No. 2548, United Textile Workers, 391 F. Supp. 287, 293 (D.R.I. 1975) (irreparable harm where work stoppage is likely to continue at great economic harm to employer); Educational and Recreational Services, Inc. v. United Steelworkers of America, Local 8751, 1980 WL 2165 at *3, 90 Lab. Cas. (CCH) ¶ 12, 623  (D. Mass. October 29, 1980)[2] (contractual liabilities for money damages for terminating underlying contract together with the difficultly of ascertaining damages amounted to irreparable harm); Elevator Mfrs. Ass'n, 342 F. Supp. at 373 (injunction issued when employer alleged that work stoppage will prevent performance of contracts by required completion dates); Dannon Company v. Whelan, 555 F. Supp. 361, 366-67 (S.D.N.Y. 1983) (permanent loss of sales constitutes irreparable harm); Restaurant Assoc. Indus. Inc. v. Transportation, Terminal Interplant & Commissary Food Employees Union of Hotel, Rest. Employees & Bartenders, Local 71, 66 Lab. Cas. (CCH) ¶ 11,967 (E.D.N.Y. 1971) (continued loss of business and goodwill produces irreparable damage).

This Court's decision in Winston is particularly instructive with respect to the elements that constitute irreparable harm for the purpose of a Boys Markets injunction:

---

[2]      Pursuant to LR 7.1(j), copies of unpublished decisions are attached at.

[A]ny strike against D&M would cause immediate and substantial financial losses. In addition, Ford might exercise its contractual right to terminate its business relationship with D&M due to D&M's inability to perform under their contract. Finally, D&M's goodwill and long-term business relationship with Ford under their five-year contract would be seriously undermined. D&M's ability to competitively pursue future business contracts in the industry also would be hindered.

879 F. Supp. at 725 (citing United States v. Cunningham, 599 F.2d 120, 127 (6th Cir. 1979)).

The factors establishing irreparable harm are established here. As a result of IUEC's and Local 4's directive, emergency repair work will not be performed on behalf of any of Otis' customers.

The Unions' refusal to work is jeopardizing Otis's ability to fulfill its contractual obligations and to deliver prompt and effective emergency repair service to its customers. The Union's refusal to work also is increasing the potential for harm to third parties, as broken elevators requiring emergency service are a hazard to passers-by at the hospitals, malls and office buildings where Otis elevators are located. (Complaint ¶27, 29, 31).

The Union's actions also are jeopardizing Otis's relationship with its customers. Otis vies with several other elevator and escalator manufacturers in an extremely competitive market. The market for escalator maintenance in particular is extremely competitive, and the Union's continued actions would severely jeopardize Otis's ability to secure such contracts with its customers in the future. (Complaint ¶27, 29, 31 ).

The balance of harms also decidedly tips in Otis's favor. The Company has followed all of its contractual obligations in good faith and will suffer severe damage and loss of goodwill if this Court fails to grant the requested injunctive relief. Conversely, interim equitable relief in favor of the Company will cause the Union no injury whatsoever. The Union merely will be "held to its agreement to arbitrate this dispute without recourse to a work stoppage." New York Times Co. v. Newspaper & Mail Deliverers' Union, 592 F. Supp. 1043, 1051 (S.D.N.Y. 1984).

10

"The effect on the [U]nion if [injunctive relief] is granted is less onerous than the harm which [will] be suffered by the [Company] if the injunction is not granted." Boys Markets, 398 U.S. at 235; see also National Elevator Indus., 776 F.2d at 378 (neither the union nor individual defendants suffered harm as a result of the injunction).

Since all of the requirements for equitable relief have been satisfied in this case, this Court should enjoin the Defendants' activities. These activities violate the no-strike clause in the Agreement, concern a grievance that the parties are bound to arbitrate and are causing irreparable harm to Otis.

### B.    The IUEC is Responsible for its Members' Violation of the No-Strike Clause

A union may not insulate itself from responsibility for the acts of its members by the simple device of disavowing such activities either prospectively or retroactively. There is ample evidence in this case that the IUEC instigated the current strike. As discussed below, any argument by the IUEC disclaiming responsibility for, or authorization of, the work stoppage, is wholly unsupported in fact and law, and should be squarely rejected by this Court.

In Carbon Fuel Co. v. United Mine Workers, 444 U.S. 212, 216 (1979), the Supreme Court addressed whether an international or district union may be held liable for the local's unauthorized actions that violate a collective bargaining agreement.[3]  In limiting the responsibility of unions for strikes in breach of contract to cases where the union may be found responsible according to the common-law rule of agency, the Court held that an international union cannot be liable unless it instigates, supports, ratifies or encourages the local's unlawful activity. Id. at 213-16.  See also Alexander v. Local 496, Laborers' Int'l Union, 177 F.3d 394, 409 (6th Cir. 1999), (citing Carbon Fuel and holding that "the district court correctly found that

---

[3]    The Court, however, was careful to distinguish the situation in Carbon Fuel Co. from one in which a local union takes actions, authorized by the parent union, which violate a contract. Id. at n.5.

[the international union] is liable both vicariously and directly") cert. denied, 528 U.S. 1154 (2000); see also Central States Southeast & Southwest Areas Pension Fund v. Kraftco, Inc., 799 F.2d 1098, 1112 (6th Cir. 1986) (common law agency principles apply to labor disputes), cert. denied, 479 U.S. 1086 (1987).

Any argument by the IUEC that it is not liable for the illegal work stoppage at issue here fails under either test because of the IUEC's agency relationship with Local 4 and its active participation and support of the current strike.

The Supreme Court made clear in Carbon Fuel Co. that an international union is responsible under § 301 for any authorized strike that violates a contract. 444 U.S. at 216, n.5. The work stoppage at issue here was not the unilateral action of Local 4. Rather, it is likely that the work stoppage was authorized and initiated by the IUEC. Moreover, even if there were no direct evidence that IUEC is leading the current work stoppage, compelling evidence of the IUEC's direct involvement and authorization of the current strike is established by Article XIV of the Agreement, which provides that: "No strike [can] be called against the Employer by the Union unless the strike is approved by the International Office of the International Union of Elevator Contractors . . ." (emphasis added). Accordingly, it would not be credible for the IUEC to suggest that it has not authorized and approved the work stoppage, given the express language of the Agreement. Under the Supreme Court's clear pronouncement in Carbon Fuel Co., the IUEC is liable for the Union's illegal strike.

Moreover, even assuming that the IUEC did not authorize the current strike (which is expressly denied), it would still liable where it independently participated in and supported Local 4's unlawful conduct. Otis therefore respectfully requests that the Court hold the IUEC jointly

and severally liable with Local 4 based on its participation in, and support of, the unlawful work stoppage.

## CONCLUSION

For all of the foregoing reasons, this Court should enjoin Defendants from violating the collective-bargaining agreement, order the parties to arbitrate pursuant to said Agreement, and order other relief as requested in the Complaint.

Respectfully submitted,

ATTORNEYS FOR PLAINTIFF
OTIS ELEVATOR COMPANY

Nathan L. Kaitz (BBO #256760)
Morgan, Brown & Joy, LLP
One Boston Place, 16th Floor
Boston, MA  02108
Tel.  (617) 523-6666
Fax.  (617) 367-3125
E-mail nkaitz@morganbrown.com

Dated :  November 24, 2004

13